UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>FEDERAL BUREAU<br>OF INVESTIGATION, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:11-cv-07562-WHP<br>)<br>)<br>)<br>)<br>)<br>) |

DECLARATION OF JENNIFER L. HUDSON
DIRECTOR, INFORMATION MANAGEMENT DIVISION,
OFFICE OF THE CHIEF INFORMATION OFFICER,
OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

Pursuant to 28 U.S.C. § 1746, I, Jennifer L. Hudson, declare the following to be true and

correct:

1.      I am the Director of the Information Management Division ("IMD") for the

Office of the Director of National Intelligence ("ODNI"). I have held this position since May,

2013. I joined ODNI in 2007 as the Chief, Information Review and Release Branch, and was

directly involved in the creation of ODNI's IMD. After a one-year assignment working in the

ODNI's Office of Legislative Affairs, I returned to IMD and assumed my current position as the

Director of that office. Prior to my arrival in ODNI, I held information management positions in

the Joint Personnel Recovery Agency, the Defense Prisoner of War/Missing Persons Office, and

later in the Public Access Branch at the Defense Intelligence Agency.

2.      IMD is responsible for facilitating the implementation of information

management-related Executive orders, laws, regulations, and ODNI policy. This function entails controlling information throughout its life cycle and includes the areas of records management, classification management and declassification, pre-publication reviews, and responding to requests under the Freedom of Information Act ("FOIA") and the Privacy Act ("PA").

3.     Under a written delegation of authority by the Director of National Intelligence ("DNI") pursuant to section 1.3(c) of Executive Order 13526, I hold original classification authority ("OCA") at the TOP SECRET level. I am authorized, therefore, to conduct classification reviews and to make original classification and declassification decisions for intelligence information up to and including the TOP SECRET level. In my current position, I am the final decision-making authority regarding FOIA and PA processing for the ODNI/IMD.

4.     Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA request. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

5.     I submit this declaration in support of the Department of Justice's ("DoJ") Motion for Summary Judgment in this proceeding. The purpose of this declaration is to explain, to the fullest extent possible on the public record, the actions taken by the Intelligence Community ("IC") in responding to ACLU's request for information under the FOIA, 5 U.S.C. § 552, especially in light of the overall declassification review initiative that the IC is currently undertaking concerning certain sensitive U.S. Government surveillance programs. Certain information regarding specific withholdings can only be explained in a classified declaration, and, as such, I have also executed a separate *ex parte, in camera* classified declaration dated April 4, 2014.

## I.    ODNI BACKGROUND

6.    Congress created the position of the DNI in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1101(a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending Sections 102 through 104 of Title I of the National Security Act of 1947). Subject to the authority, direction, and control of the President, the DNI serves as the head of the IC, and as the principal adviser to the President and the National Security Council for intelligence matters related to the national security. 50 U.S.C. §§ 3023(b)(1), (2).

7.    The responsibilities and authorities of the DNI are set forth in the National Security Act. These responsibilities include ensuring that national intelligence is provided to the President, heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof. 50 U.S.C. § 3024(a)(1). The DNI is charged with establishing the objectives of; determining the requirements and priorities for; and managing and directing the tasking, collection, analysis, production, and dissemination of national intelligence by elements of the IC. 50 U.S.C. §§ 3024(f)(1)(A)(i) and (ii).

8.    In addition, the National Security Act, as amended, provides that the DNI "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). Consistent with this responsibility, the DNI establishes and implements guidelines for the IC for the classification of information under applicable laws, Executive orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(2)(A), (B).

9.    The function of the ODNI is to assist the DNI in carrying out his duties and responsibilities under the National Security Act and other applicable provisions of law, and to

3

carry out such other duties as may be prescribed by the President or by law.

## II.   **ACLU'S FOIA REQUEST**

10.    By letter sent to the Federal Bureau of Investigation ("FBI"), and DoJ's Office of Information Policy, Office of Public Affairs, Office of Legal Counsel, and National Security Division ("NSD"), dated May 31, 2011, plaintiffs, American Civil Liberties Union and American Civil Liberties Union Foundation (collectively, "ACLU"), requested records pertaining to the U.S. Government's interpretation or use of Section 215 that were drafted, finalized, or issued after March 9, 2006.

11.    By letter dated August 22, 2011, NSD informed ACLU that it had searched its files and located responsive records, releasing three documents in full, but denying in full additional records based on FOIA Exemption 1.

12.    By letter dated September 22, 2011, ACLU appealed NSD's response. ACLU then filed this lawsuit on October 26, 2011, before NSD could respond to ACLU's appeal.

13.    On December 9, 2011, the Court entered a Stipulation that reflected ACLU's agreement to narrow the scope of its request to include only:

> a.    Legal opinions or memoranda concerning or interpreting Section 215 of the USA PATRIOT Act ("Section 215");[1]
>
> b.    Guidelines for government personnel regarding the use of Section 215;
>
> c.    Reports provided to Congress by the FBI or DoJ concerning or memorializing the Executive Branch's interpretation or use of Section 215;
>
> d.    Reports, opinions, or memoranda of the Foreign Intelligence Surveillance Court ("FISC") concerning or interpreting Section 215; and

---

[1] The "business records" provision of the Foreign Intelligence Surveillance Act, enacted by Section 215, codified at 50 U.S.C. section 1861.

  e. Legal opinions or memoranda concerning or interpreting rulings, opinions,

  or memoranda of the FISC interpreting Section 215.

ACLU also agreed to exclude drafts of documents, acquisition applications or supporting

documentation submitted to the FISC, and electronic mail messages.

  14. On March 15, 2012, April 15, 2012, May 15, 2012, and August 20, 2012, the U.S.

Government released additional documents responsive to ACLU's narrowed FOIA request, and

withheld other documents in full pursuant to FOIA Exemptions 1 and 3.

  15. In February 2013, the parties moved for summary judgment. However, for the

reasons described below, these motions were eventually withdrawn and the U.S. Government

reprocessed and released in full or in part many of the documents that it had originally withheld

in full. I understand that on February 6, 2014, the ACLU narrowed its challenge to fully

withheld opinions or orders of the FISC that relate to bulk collection.

  16. In Part III of this declaration I will explain the overall declassification initiative

that the IC is currently undertaking with respect to certain U.S. Government surveillance

programs, and the re-processing of documents responsive to ACLU's FOIA request. In Part IV,

I describe the continued withholding by the IC of documents that remain at issue in this

litigation, and the basis for the FOIA exemptions asserted to support these withholdings.

## III. IC DECLASSIFICATION INITIATIVE AND RE-PROCESSING OF DOCUMENTS RESPONSIVE TO ACLU'S FOIA REQUEST

  17. On or about June 6, 2013, *The Guardian* and *The Washington Post* published

articles and documents received from former National Security Agency ("NSA") contractor

Edward Snowden. This unprecedented unauthorized disclosure of TOP SECRET documents

touched on some of the U.S. Government's most sensitive national security programs, including

highly classified and on-going signals intelligence collection programs.

18.    NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information, of which communications intelligence is a significant subset, for (a) national foreign intelligence purposes, (b) counterintelligence purposes, and (c) the support of military operations. *See* E.O. 12333, section 1.7(c), as amended.  In performing its SIGINT mission, NSA exploits foreign electromagnetic signals to obtain intelligence information necessary to the national defense, national security, or the conduct of foreign affairs.  Public disclosure of either the capability to collect specific communications or the substance of the information itself can easily alert targets to the vulnerability of their communications.  Disclosure of even a single communication holds the potential of revealing the intelligence collection techniques that are applied against targets around the world.  Once alerted, SIGINT targets may change the way they communicate, which could inhibit access to the target's communications and, therefore, deny the U.S. Government access to information crucial to the defense of the United States both at home and abroad.

19.    One of the greatest challenges the United States faces in combating international terrorism and preventing potentially catastrophic terrorist attacks on our country is identifying terrorist operatives and networks, particularly those operating within the United States. Detecting and preventing threats by exploiting terrorist communications has been, and continues to be, one of the tools in this effort.  It is imperative that we have the capability to rapidly detect any terrorist threat inside the United States.

20.    One method that the IC has developed to accomplish this task is analysis of metadata associated with telephone calls within, to, or from the United States pursuant to Section 215. The term "telephony metadata" or "metadata" as used here in the context of Section 215 refers to data that are about telephone calls—such as the initiating and receiving telephone

numbers, and the time and duration of the calls—but does not include the content of those calls or any subscriber identifying information.  By analyzing telephony metadata based on telephone numbers associated with terrorist activity, trained expert intelligence analysts can work to determine whether known or suspected terrorists have been in contact with individuals in the United States.

21.     The unauthorized disclosures mentioned above included previously classified information regarding the telephony metadata collection program under Section 215.  Under this program, the FBI obtains orders from the FISC directing certain telecommunications service providers to produce all business records created by them (known as call detail records) that contain information about communications between telephone numbers, relating to telephone calls made between the United States and a foreign country and calls made entirely within the United States. The telephony metadata collection program was specifically developed to assist the U.S. Government in detecting such communications between known or suspected terrorists who are operating outside of the United States and who are communicating with others inside the United States, as well as communications between known or suspected terrorist operatives who are located within the United States.

22.     As the FISC has observed, the production of all call detail records of all persons in the United States has never occurred under this program.  In addition, by their terms, these FISC orders must be renewed approximately every 90 days.  At least 15 different FISC judges have entered a total of 36 orders authorizing NSA's bulk collection of telephony metadata under Section 215, including most recently on March 28, 2014.

23.     The unauthorized disclosures regarding this program have caused exceptionally grave harm to our national security and threaten long-lasting and potentially irreversible harm to

our ability to identify and respond to threats. Nonetheless, in order to correct misinformation flowing from the unauthorized disclosures, and to reassure the American public as to the numerous safeguards that protect privacy and civil liberties, starting on June 6, 2013, the DNI declassified certain information, including information regarding the telephony metadata collection program under Section 215.

24.     In addition, to reassure the American people that the Section 215 telephony metadata collection program is lawfully authorized and operated, and to inform the discussion surrounding it, on June 20, 2013, the President directed the DNI to continue to review whether further information could be declassified, and to reassess the extent to which there may be information that can be released regarding the legal rationale, protections, and nature of the oversight of this surveillance program consistent with the interests of national security. *See* Section 3.1(c) and (d) of E.O. 13526. To that end, the DNI was directed to review the FISC opinions and filings relevant to the program to determine what information could be declassified.

25.     The U.S. Government has since engaged in a large-scale, multi-agency review process led by ODNI to determine what further information concerning the Section 215 program and other surveillance programs could be declassified and released consistent with the national security for the purpose of restoring public confidence and better explaining the legal rationale and protections surrounding the programs. The latter consideration is a policy decision that must be weighed and decided at the highest levels of the U.S. Government. The overarching policy goal of this effort is to inform the public as much as possible, consistent with protecting the national security, for the purpose of fostering an informed public debate and restoring public confidence that surveillance intelligence programs are lawful, properly authorized, and conducted in a manner consistent with the privacy and civil liberties of Americans.

Reprocessing of documents responsive to ACLU's FOIA request was generally conducted as part of this broader review.

26.     This review has been extraordinarily complex and thorough.  It has required a diligent and arduous balancing of the public interest in an informed public discussion on the one hand, with the harm to national security that could result from providing information that could identify U.S. intelligence capabilities, thus making it easier for our adversaries to evade detection, on the other.  In the process, relevant components of the national security community have had to consider each piece of information identified for possible declassification and anticipate the ramifications such declassification might have on their operations, including the ability to gather intelligence in the future.  An important component of the analysis was consideration of the information already in the public domain, and how official disclosures might allow our adversaries to fit new pieces of information together with those already in the public domain to create an even more revealing picture of our nation's intelligence capabilities, including its signals intelligence capabilities.

27.     After the inter-agency review described above, the DNI chose to exercise his discretion under E.O. 13526 to declassify certain information because he found extraordinary circumstances existed where the public interest in disclosure outweighed the harm to national security that would result.  Consistent with these declassifications, on September 10, 2013, September 17, 2013, October 11, 2013, October 28, 2013, November 18, 2013, January 17, 2014, February 12, 2014, and most recently on March 28, 2014, the IC publicly released a number of documents pertaining to collection of information, including telephony metadata, under Section 215.  These documents included documents responsive to ACLU's FOIA request that were previously withheld in full as, *inter alia*, classified, as well as additional documents not

responsive to ACLU's request or part of this FOIA litigation. So far, approximately 2,400 pages of material related to intelligence surveillance activities under the Section 215 telephony metadata collection program and other programs have been declassified and released to the public. They have all been made available on an ODNI website, ICOntheRecord.tumblr.com, which is designed to provide immediate, on-going, and direct access to factual information related to the lawful foreign surveillance activities carried out by the IC. It provides a single online location to access new information as it is made available from across the IC.

28.     Information collected pursuant to the U.S. Government's authority under Section 215 is among the most important and valuable foreign intelligence information the U.S. Government collects, and is used to protect the country from a wide variety of terrorist threats. While the existence of the authority under Section 215 is set forth in public statutory provisions, and as stated above certain information about the telephony metadata collection program has been declassified, other information regarding the U.S. Government's use of this authority – such as the operational details as to specific applications of the sources and methods used by the U.S. Government to carry out that authority – remains highly classified.

29.     At the time of the unauthorized disclosures discussed above, and the first of the DNI's subsequent decisions to exercise his discretion under E.O. 13526 to declassify certain information regarding the telephony metadata collection program under Section 215, the parties' initial motions for summary judgment were in the process of being briefed. On June 7, 2013, the Government requested that the parties' motions for summary judgment be held in abeyance while the U.S. Government assessed the effects of the unauthorized disclosures and subsequent declassifications on the U.S. Government's withholdings in this case. The parties eventually withdrew their motions for summary judgment and the U.S. Government reprocessed the

documents responsive to the ACLU's FOIA request that had previously been withheld in full.

## IV.   EXPLANATION OF WITHHELD MATERIAL

30.    The purpose of this declaration is to advise the Court that the IC withheld certain

FISC Opinions and Orders, as set forth below, because they are properly exempt from disclosure

in their entirety under FOIA Exemptions 1 and 3.  This is so because the FISC Opinions and

Orders remain currently and properly classified in accordance with E.O. 13526 and are protected

from release by statutes, including Section 6 of the National Security Agency Act of 1959 (Pub.

L. No. 86-36) (codified at 50 U.S.C. § 3605) ("NSA Act"), which prohibits disclosure of

information related to the NSA's functions and activities; and Section 102A(i)(1) of the National

Security Act of 1947, as amended (codified at 50 U.S.C. § 3024(i)(1)), which prohibits

disclosure of intelligence sources and methods information.

31.    As noted above, the ACLU has narrowed its challenge to "fully withheld opinions

or orders of the Foreign Intelligence Surveillance Court that relate to bulk collection of any

information (i.e., not just telephony metadata)."[2]  Based on that narrowing, the following

documents remain at issue:

- A FISC opinion, dated August 20, 2008, totaling six pages.  This FISC opinion is No. 50 in the U.S. Government's *Vaughn* Index.  In addition, non-identical versions of this FISC opinion were contained in two productions to Congress. The versions of this opinion produced to Congress are Nos. 13A and 82A in the U.S. Government's *Vaughn* Index.

- An unspecified number of FISC orders, issued on various dates during the range of dates applicable to the ACLU's FOIA request (*i.e.*, March 9, 2006 to June 30, 2011), including certain FISC orders, dated October 31, 2006, that were produced to Congress.  The FISC orders that were produced to Congress are listed in the U.S. Government's *Vaughn* Index at Nos. 77B, 77C, 79, 81J. Additional FISC Orders are identified in the U.S. Government's *Vaughn* Index at No. 125 *et seq.*

---

[2] I further understand that the ACLU has agreed that it is not challenging the following categories of information contained within the withheld records:  (1) targets of FBI investigations; and (2) the identities of FISC or other U.S. Government employees withheld pursuant to FOIA Exemptions 6 and 7(C).

A.   **FOIA EXEMPTION 1**

32.    The FISC Opinions and Orders at issue here in this litigation have been withheld in full pursuant to FOIA Exemption 1. Exemption 1 of the FOIA protects from release matters that are specifically authorized under criteria established by an Executive order to be kept classified in the interest of the national defense or foreign policy, and are in fact properly classified pursuant to such Executive order. 5 U.S.C. § 552(b)(1). The current Executive order which establishes such criteria is E.O. 13526.

33.    Section 1.1 of E.O. 13526 provides that information may be originally classified if:  1) an OCA is classifying the information; 2) the information is owned by, produced by or for, or is under the control of the U.S. Government; 3) the information falls within one or more of the categories of information listed in section 1.4 of the Executive Order; and 4) the OCA determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the OCA is able to identify or describe the damage.

34.    Section 1.2(a) of E.O. 13526 provides that information shall be classified at one of three levels.  Information shall be classified at the TOP SECRET level if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security.  Information shall be classified at the SECRET level if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security.  Information shall be classified at the CONFIDENTIAL level if its unauthorized disclosure reasonably could be expected to cause damage to the national security.

35.    In addition, information shall not be considered for classification unless it falls within one of the categories described in Section 1.4 of E.O. 13526.  The relevant categories for purposes of this case are section 1.4(c), which allows information to be classified if it pertains to

"intelligence activities (including covert action), intelligence sources or methods, or cryptology;" section 1.4(d), which include foreign relations or foreign activities of the United States, including confidential sources; and section 1.4(g), which include vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security.

### B.    FOIA EXEMPTION 3

36.    In addition to being withheld in full pursuant to FOIA Exemption 1 as described above and more fully below, the FISC Opinions and Orders at issue have also been withheld in full pursuant to FOIA Exemption 3.  Exemption 3 provides that FOIA does not require the production of records that are:

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).[3]

37.    The FISC Opinions and Orders at issue here in this litigation fall squarely within the scope of one or both of two statutes.  The first applicable statute is Section 102A(i)(l) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), which provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  The protection afforded to intelligence sources and methods is absolute.  Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024(i)(1).

---

[3] The OPEN FOIA Act of 2009 was enacted on October 28, 2009, Pub. L. No. 111-83, 123 Stat. 2142, 2184, 5 U.S.C. § 552(b)(3)(B), after the applicable National Security Act and NSA Act provisions were enacted, and therefore is not applicable to the analysis in this case.

38.     The second statute is a statutory privilege unique to NSA. As set forth in section 6 of the NSA Act, Public Law 86-36 (50 U.S.C. § 402 <u>note</u>), "[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof. . . . " Congress, in enacting the language in this statute, decided that disclosure of any information relating to NSA activities is potentially harmful. Federal courts have held that the protection provided by this statutory privilege is, by its very terms, absolute. Section 6 states unequivocally that, notwithstanding <u>any</u> other law, which includes FOIA, NSA cannot be compelled to disclose <u>any</u> information with respect to its functions or activities. To invoke this privilege, the U.S. Government must demonstrate only that the information it seeks to protect falls within the scope of Section 6. Further, while in this case the harm would be serious or exceptionally grave, the U.S. Government is not required to demonstrate specific harm to national security when invoking this statutory privilege, but only to show that the information relates to its functions or activities. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

39.     As described above, these statutes protect the fragile nature of U.S. intelligence sources, methods, and activities, to include but not limited to, the existence and depth of signals intelligence-related successes, weaknesses and exploitation techniques. These statutes recognize the vulnerability of intelligence sources and methods, including signals intelligence, to countermeasures and the significance of the loss of valuable intelligence information to national policymakers and the IC.

**C.     WITHHELD-IN-FULL FISC OPINION, DATED AUGUST 20, 2008**

40.     As discussed further below, the FISC Opinion, dated August 2008, Docket No.

08-07 ("August 2008 FISC Opinion"), is withheld in full pursuant to FOIA Exemptions 1 and 3.[4]

I am able to provide some explanation of the reasons this opinion must be withheld in full in this unclassified declaration because, as a result of the IC declassification initiative discussed above, some of the facts needed to explain the withholdings in this document do not themselves reveal intelligence sources, methods, or activities that remain classified.

41.     The August 2008 FISC Opinion addresses the NSA's use of a specific intelligence method in the conduct of queries of telephony metadata or call detail records obtained pursuant to the FISC's orders under the telephony metadata collection program.  The opinion is six pages in length and the specific intelligence method is discussed in every paragraph of this opinion, including in the title.  As noted further below, I have determined that there is no meaningful, segregable, non-exempt information that can be released to the ACLU, as the entire opinion focuses on this intelligence method.  Even if the name of the intelligence method was redacted, the method itself could be deduced, given other information that the DNI has declassified pursuant to the President's transparency initiative and the sophistication of our Nation's adversaries and foreign intelligence services.

42.     Although some information regarding this intelligence method is by itself unclassified, in the context of a FISC opinion addressing the conduct of queries of telephony metadata, the intelligence method remains currently and properly classified.  Thus, the entire opinion is currently and properly classified based on the procedure of classification by compilation.[5]  See E.O. 13526, Section 1.7(e) ("Compilation of items of information that are

---

[4]  The August 2008 FISC Opinion also contains some of the information that the ACLU does not challenge, namely the targets of investigations and the identities of FISC and U.S. Government personnel.

[5]  Even the case caption is exempt as it identifies the telecommunications service providers who are ordered to produce call detail records and the targets of FBI investigations.  See infra ¶¶ 56-58.  The only information that could be releasable is the docket number BR 08-07, which is not meaningful as it does not provide any information to the ACLU regarding the substance of the order beyond what is included in this declaration and the fact that it is a

individually unclassified may be classified if the compiled information reveals an additional association or relationship that: (1) meets the standard for classification under this order; and (2) is not otherwise revealed in the individual items of information.").

43.     Based on the procedure of classification by compilation, the August 2008 FISC Opinion, if disclosed, would reveal an intelligence method that is used in various intelligence activities, including queries of telephony metadata, and accordingly, this information meets the substantive criteria for classification under Sections 1.4(c), 1.4(d), and 1.4(g) of E.O. 13526. Additionally, the August 2008 FISC Opinion meets the requirements of Section 1.1(a) of E.O. 13526 because it was classified by an OCA; is owned by, produced by, for, or is under the control of the U.S. Government; and, as described below, its unauthorized disclosure reasonably could be expected to result in exceptionally grave damage to the national security. The August 2008 Opinion is therefore currently and properly classified TOP SECRET, and is exempt from release in its entirety based on FOIA Exemption 1.

44.     I have determined that the release of this intelligence method could reasonably be expected to cause exceptionally grave damage to the national security because its release could allow our adversaries to undertake countermeasures that would degrade the effectiveness of NSA's querying of the bulk metadata. Such countermeasures cannot be discussed in a public declaration without revealing the very information that the IC is protecting from release pursuant to FOIA Exemptions 1 and 3--this intelligence method. If the effectiveness of the intelligence method is degraded, NSA would no longer be able to rely on this method, and NSA's ability to analyze telephony metadata would itself then be compromised. A lost or reduced ability to detect communications chains that link to identifiers associated with known and suspected

---

document responsive to the ACLU's FOIA request.

terrorist operatives, which in turn can lead to the identification of previously unknown persons of interest in support of anti-terrorism efforts both within the United States and abroad, would greatly impact the effectiveness of this program. This is because there is no way to know in advance which numbers will be responsive to the authorized queries.

45.     The August 2008 FISC Opinion has been reviewed for purposes of complying with FOIA's segregability provision, which requires the U.S. Government to release "any reasonably segregable portion of a record" after proper application of the FOIA exemptions. 5 U.S.C. § 552(b). An intensive, line-by-line review of this opinion was performed by multiple IC agencies, which determined that it contains no reasonably segregable, non-exempt information. This pertains even to otherwise unclassified information that is contained in this opinion, including legal analysis. The legal analysis in this opinion cannot reasonably be segregated and released without risking disclosure of the intelligence method discussed therein.

46.     Further, it is my judgment that any information in the August 2008 FISC Opinion that, viewed in isolation, could be considered unclassified, is nonetheless classified in the context of this opinion because it can reasonably be expected to reveal (directly or by implication) classified national security information when combined with other information that might be available to the public or adversaries of the United States. In these circumstances, the disclosure of even seemingly mundane portions of this opinion, when considered in conjunction with other publicly available information, could reasonably be expected to assist a sophisticated adversary in deducing the particular intelligence method discussed therein, and possibly lead to the use of countermeasures that may deprive the United States of critical intelligence.

47.     Thus it is my judgment that, although certain legal analysis set forth in the August 2008 FISC Opinion may be unclassified when viewed in isolation, it is not reasonably segregable

here because, when viewed in the context of this FOIA request and other public information, it would tend to reveal information about the classified intelligence method at issue in the balance of the document. In particular, legal analysis would tend to reveal how statutory and judicial authority is being applied in a specific context to the use or application of the particular intelligence method discussed in this opinion.

48.     The intelligence method discussed in this opinion is also protected from public release pursuant to Section 6 of the NSA Act because the intelligence method pertains to a function of the NSA – in fact, one of NSA's most important functions: its SIGINT mission, and activities undertaken to carry out its SIGINT mission. Similarly, this intelligence method is protected from release pursuant to the National Security Act, as amended, 50 U.S.C. § 3024(i)(1).

49.     I cannot further explain the reasons for the classification of this intelligence method on the public record without risking disclosure of classified information. Accordingly, for the Court's *in camera* consideration, I have provided a classified, *ex parte* declaration further explaining why the release of this FISC Opinion, even in part, likely would result in the disclosure of this intelligence method, and a more detailed discussion of the harm to the national security that could reasonably be expected should this intelligence method be disclosed.

**D.     REMAINING FISC ORDERS WITHHELD IN FULL**

50.     Document Nos. 77B, 77C, 79, 81J, and the multiple FISC orders identified in No. 125 *et seq*. (the "Additional FISC Orders"), have been withheld in full pursuant to FOIA Exemptions 1 and 3. These documents are described more fully in my classified declaration submitted to the Court *ex parte*. Document Nos. 77B, 77C, 79, and 81J are non-identical duplicates of FISC orders that are included in the set of FISC Orders identified in No. 125 *et.*

*seq.* The total number of FISC orders withheld in full cannot be provided on the public record, nor can the records be described individually on the public record because to do so would reveal classified and statutorily-protected information relating to sources and methods of intelligence collection, including, among other things, the identity of telecommunications carriers participating in the bulk telephony metadata program and the timing of their participation.

51.     While the scope of the IC declassification initiative has been substantial, and has permitted some unclassified discussion of the justifications for withholding the August 2008 FISC Opinion discussed in subsection C above, the same does not hold true with regard to the Additional FISC Orders.  Other information regarding the intelligence sources and methods the U.S. Government uses to carry out its authority under Section 215 remains classified and its disclosure through the Additional FISC Orders reasonably could be expected to result in serious or exceptionally grave damage to the national security.

52.     In consultation with IC officials, I have determined that the U.S. Government cannot publicly disclose further details about the number or nature of the Additional FISC Orders.  The number of Additional FISC Orders that are being withheld in full under FOIA Exemption 1, as well as the dates of these orders, remain currently and properly classified in accordance with E.O. 13526.  In addition, no further information about the nature or substance of the Additional FISC Orders can be provided without revealing classified information.  Further, the information that the U.S. Government is protecting here was not and cannot be examined in isolation.  Instead, it was evaluated with careful consideration given to the impact that its disclosure would have on other information that remains currently and properly classified.

53.     Any further information about the Additional FISC Orders, including the number of FISC Orders that are being withheld in full, their dates, and information about the nature or

substance of the orders, is classified at the SECRET or TOP SECRET levels, and meets the substantive requirements of E.O. 13526 § 1.1(a) because: (1) the information was classified by an OCA; (2) is owned by, produced by or for, or is under control of the U.S. Government; (3) falls within § 1.4(c) of E.O. 13526; and (4) an OCA determined that unauthorized disclosure of the information reasonably could be expected to result in serious or exceptionally grave damage to the national security. To the extent possible on the public record, a description of some of that damage is set forth below. Additional damage to the national security is described in my classified, *ex parte* declaration.

54.    The number of Additional FISC Orders being withheld in full, as well as their dates and any additional information regarding the nature or substance of the Additional FISC Orders, is being withheld in full pursuant to FOIA Exemption 1 in order to protect classified intelligence activities, sources, and methods used against intelligence targets and adversaries. This includes, among other things, protecting the identity of telecommunications carriers directed to provide bulk business records and the timing of their provision of these records.

55.    Given the information that has already been declassified and released regarding the U.S. Government's intelligence activities pursuant to Section 215, including several released-in-part FISC Opinions and Orders related to these activities that do not specifically identify the entities that are subject to FISC Orders, disclosing the number and dates of the Additional FISC Orders at issue in this litigation could provide a sophisticated adversary the ability to deduce the number of entities subject to FISC Orders, which in turn would tend to reveal the identity of the entities subject to FISC Orders. For example, the U.S. Government has declassified and released some FISC orders related to the bulk telephony metadata program that direct the production of call detail records that contain information about communications between telephone numbers.

These are sometimes referred to as "primary orders." The release of the number of

corresponding FISC orders directed to entities that are subject to these orders, even if the names

of the entities are redacted, would reveal the number of entities subject to those orders, which in

turn would tend to reveal the identity of those entities.

56.    Furthermore, releasing the identities of any entity required by a FISC order to

produce business records to the U.S. Government would disclose classified intelligence sources,

and would alert the targets of these national security investigations as to which business records

the U.S. Government does and does not collect, as well as the nature and scope of the U.S.

Government's intelligence activities under Section 215. With this information, our adversaries

would be able to take countermeasures and undermine the IC's national security mission. For

example, knowledge of the identity of those entities being directed to provide the bulk business

records could allow the target of national security investigations to frustrate U.S. Government

collection by moving their business to other entities or changing their pattern of activities

altogether. This could result in an inability to access targets' business records and therefore

result in a loss of access to information crucial to the national security and defense of the United

States.

57.    Moreover, others who may be collaborating with our Nation's adversaries would

soon cease engaging in these detectable activities with similar results. These individuals and

entities search constantly for information regarding the intelligence activities of the U.S.

Government. They are able to gather information from myriad sources, analyze this information,

and create ways to defeat collection activities from seemingly disparate pieces of information.

Consequently, any disclosure of information about the Additional FISC Orders, including the

number of such orders withheld in full, the dates of the orders, and information about the nature

and substance of the orders, could reasonably be expected to cause serious and in some cases exceptionally grave damage to the national security, and is therefore classified as SECRET or TOP SECRET.

58.    Likewise, information about the Additional FISC Orders, including the number of orders withheld in full, the dates of the orders, and information about the nature and substance of the orders is withheld under FOIA Exemption 3 and protected from public release by statute, including pursuant to Section 102A(i)(l) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." For example, revealing any information about the Additional FISC Orders would provide our adversaries, to include the targets of these national security investigations, with information from which they could deduce the intelligence sources for the call detail records (the entities who have received orders from the FISC to produce business records). Thus, this information falls squarely within the protection of this statute and is afforded absolute protection from release.

59.    The withholding of the Additional FISC Orders in their entirety is appropriate and consistent with FOIA's requirements. The withholding of these orders in their entirety, which is the only way to protect exempt information regarding the number and nature of the Additional FISC Orders, is likewise justified based on Exemption 1 as both content and non-content information (the number of orders, etc.) would reveal the scope of the U.S. Government's intelligence collection activities pursuant to Section 215, including the identities of entities who received FISC orders. As described above, this information is currently and properly classified in accordance with E.O. 13526.

## CONCLUSION

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 4th day of April, 2014

Jennifer L. Hudson
Director, Information Management Division
Office of the Director of National Intelligence